Good morning. Please be seated. Your honor, the first case of the morning call to 14 95 Jason Barnes versus Timothy Martin. King County Child Advocacy Center, Loyola University at all. On behalf of the apple on Mr. Ronald A. Sterni Jr. On behalf of Loyola University is Mary Allen Bush. On behalf of the King County Child Advocacy Center, Ms. Aaron M. Yakey. On behalf of the city of Aurora, it is Amber and I'm standing. Thank you. We have three members on the court. One of the members is unavailable to be here this morning. However, she will listen to the arguments and rule with us on this case. Um, no. Also, I understand that the, um, appellants are going to split or Applebee's are going to split their time. Um, Miss Gay, Gay, Gay. It's going to be eight minutes. Um, Aurora five and Miss Bush to Am I correct? Actually, I think you told me in the back gave the eight. You were right. The first time. Okay, good. All right. Great. Just so you know how many minutes that you have the time and ready for them. All right. Mr Sterni, are you ready to proceed? Thank you. You may approach. May it please the court again, Ron Sterni on behalf of the plaintiff appellant, Jason Barnes. The matter comes before your honors on two rulings dismissing the case with prejudice. Um, Judge Baraka was the first judge to rule on it and she dismissed certain of the claims with prejudice and then, um, subsequently Judge Murphy heard the remainder of the case on amended complaint and dismissed the entirety of the, uh, amended claims with prejudice. Um, the court was kind enough to give notice to, uh, all counsel to focus on certain cases and I've reviewed those cases and I'm going to primarily address how they impact, uh, the claims made on appeal. Um, it's important to note that, uh, we have federal claims and we have state law claims and we have a number of immunities that have been raised, uh, by various defendants and, uh, these immunities can only serve as shields to the particular type of claims. So the, uh, for example, the absolute immunity for testimony given before a grand jury, uh, would only shield a person from liability, uh, against a federal 1983 claim. Uh, similarly, um, the claims of the sovereign immunity by Mr. Martin with respect to, uh, the, uh, from arising out of the Illinois constitution would not shield him from liability from a federal claim. So these, um, immunities have to be parsed as opposed, uh, against each type of claim. And in the complaint, there were federal claims under section 1983, um, arising out of various amendments, but also out of various substantive rights. Count one was false arrest and imprisonment, uh, arising out of the 14th amendment. Judge Browka dismissed that with prejudice and made clear in their written ruling that it was based solely on, on the question of law, that an indictment cut short any possibility of a federal claim. Did you ever ask, uh, Liev to file an amended complaint prior to, or at the time she dismissed it with prejudice? I believe we did judge and we were granted Liev to file an amended complaint. However, count one was dismissed with prejudice and it was dismissed on a question of law. It wasn't dismissed because, uh, there were insufficient allegations, um, um. Under 26, 2619. I believe it was dismissed under 615, that particular count, because there were each of the defendants, um, took 615 and 619 motions. And I can't for certain answer your honor, uh, based on my recollection, what, what, which, uh, type of 615 or 619 motion, but because I believe it was a question of law, it was a 615, but it's possible they took it under 619. So the, the false, even if it's dismissed with prejudice, you can ask to re refile it. It may be, it may not be granted, but you can ask, did you ever ask to refile that count? I did not ask to refile that count because, um, the decision was with prejudice as a matter of law. Uh, there would, it would be an exercise in futility because in essence, the facts were not changed. It was a bright line rule that really was coming to this court. Uh, and, uh, I, you know, there was no real basis, an amendment complaint to try and replete that, but with no change in the facts, no change in the law would be a set in essence, a question for reconsideration. And under the test of reconsideration, there was no valid reason as judge, uh, Bravo to reconsider her ruling. And so her position was that there was, because there was a grand jury indictment, there was probable cause. Right. And so false arrest was not, was not on the table anymore. Right. In her opinion. Right. That it's a bright line rule. And that's the position that was advanced by the defendants, that it is a bright line rule. And my attack on that is based on, um, the, the cases I cited in my brief that, and, and in Illinois, um, pronouncements on the Supreme court, uh, in one of the cases that, that we, uh, or the plaintiff cited, uh, it's, it's really the skepticism that Illinois higher courts have expressed with respect to grand jury indictments. In Fabiano versus Palos Hills, uh, there was a skepticism in the, although they didn't reach the issue of an absolute immunity, but they did reference the skepticism they had on that. And the case of the case that came after Fabiano, was there not a case that came after Fabiano? Uh, Illinois state case. Yes. Um, I am not sure if there was another case. There was a case that your honors pointed us to from the U S Supreme court. Yes. Um, finished my thought on, on, on, on, um, the question of whether an indictment cut short a federal claim. Uh, it is as the Supreme court said in the, uh, Freedie's case, it is a formal accusation of a crime. And, um, the question of probable cause is one for the jury. And in this case, the trier of fact never, ever would reach it because it was dismissed. And I'm saying, I'm arguing here that that was error on the part of the trial judge to cut short the federal claims simply because there was an indictment. Which defendants? Uh, that would be Martin and Jones with respect to the first amendment. But I do believe, and there was a conspiracy, uh, claim attached to that federal claim. But I do believe that judge Bronco's ruling extended out, uh, either directly or indirectly onto the other federal claims pertaining or arising out of the indictment, specifically malicious prosecution, which is a state law claim. And, uh, the, uh, same, I think, reasoning was applied again by judge Murphy, that it's a bright line, um, rule that you have an indictment that therefore you cannot proceed with malicious prosecution. And I would submit that as an error. I would like, uh, and now turning to the issue of how. Was there other evidence in and of itself, other than the police officer's testimony before the grand jury that would have caused the indictment? Was there other evidence? Right. Um, any other witnesses, any other evidence? There was, there was, there was, I mean, whether or not it tended to prove probable cause, I would argue against it, but there were other, there were multiple witnesses. Um, but I, I think they tend to favor the plaintiff in this case and what the, what ultimately happened before the grand jury proceeding was specifically with respect to Dr. Gamelli and what we honed in on were the statements made, um, by, uh, Mr. Jones that were not true based on what he was told by Dr. Gamelli, who all along said. He did not testify. Dr. Gamelli did not testify. No. Did the neighbor testify? No. Before the grand jury. Yes. No. So who else testified before the grand jury? I don't believe anyone else testified before the grand jury other than Mr. Um, so you're submitting that, but for his false testimony, there would not have been an indictment returned. Correct. That would be a logical conclusion. If there were no other, no other, no other evidence presented, I presume all evidence is presented through witnesses, then there would be no indictment. Um, with respect to the Supreme court's ruling in rubber versus Polk, which I think may be the case your honor was referencing. I've read this opinion, um, quite carefully and what on its face, it it's tailored specifically to section 1983 claims. They do not, the Supreme court does not expand this beyond, uh, a federal section 1983 claim and takes somewhat pains to make sure in their, their, uh, preparatory analysis of why this ruling is tailored to that situation. So that's why I was asking you, is there other testimony other than the officer's testimony before the grand jury that have caused an indictment? Because that's basically what the Rayburn case says. If the claim is not based solely on the grand jury testimony, then there is no immunity. But if it's based solely on the grand jury test, there is immunity, but if it's based solely on the grand jury testimony, grand jury testimony was false or misleading, then the immunity isn't there. Is that basically what Rayburn says? Yes. Rayburg says that if your entire claim, your civil claim is based, your federal, let me, let me be clear. Federal 1983 civil claim is based on this grand jury indictment. There is absolute immunity and therefore the claim would fail. Um, so there's two things that they're saying here. Number one, there's absolute immunity for grand jury testimony in, against a federal section 1983 claim. And in Rayburg's case, because his case, and I had to go back to the 11th circuit opinion, which gave a more detailed explanation of the facts. He, there was no indication that he was arrested, just an indictment, which he had somehow dismissed or state procedures and it was out of Georgia, I believe. In this case, there are a lot more facts and a lot more activity outside of the grand jury indictment to support the claims. So to distinguish the ultimate result of Rayburg from this case is that there are numerous facts in the amended complaint and the original complaint that go towards these counts outside of the grand jury indictment. So the grand jury indictment is one facet of the issues in this case. And by the opinion in Rayburg, you would, if there was no other basis for the civil claims in the civil federal 1983 claims, then perhaps the claims would fail, uh, based on the Rayburg decision. However, in this case, there are numerous other allegations in the complaint that go toward not only the federal 1983 claims, but also the state law counts of malicious prosecution, intentional infliction of emotional distress, interference with family relations. All right. What is the malicious prosecution facts? What are those in particular? Well, the, there was this investigation into the, uh, uh, the burning of the child. And then there were, there was activity that interfered with the family relations. And I think that all combined together, the facts are they told Mr. Barnes, he could not see his children. Uh, so, uh, and if he tried to, he would be subject to criminal sanction. Um, when they turned their back on all the statements of the neighbor, uh, the investigating initial responding officer, officer summer, Dr. Gamelli, all of this information that they had, they turned their backs on it and went forward with the prosecution and, and their activity at trial, uh, regardless of that. And I think that supports at a minimum to get past the motion to dismiss, uh, a malicious prosecution claim and an IID claim. Um, and then the interference with the family relations claim. Now, let's talk about that. You brought that up, the interference with family relation case. Right. What state law case law do you have that indicates that the state of Illinois allows such a claim? Well, there is the case that was raised by, uh, the defendants Doe versus McKay, which tends to be, uh, not affirmatively recognizing such a claim, but restricting it. And I, I distinguish that, uh, based on the fact that Doe, uh, relied on another opinion, which arose out of a case with an attendant medical malpractice claim, I believe. And the, the, the rationale for Doe is when you have other types of claims, such as medical malpractice or negligence, you're going to get your relief there. And it's just too complicated to go forward. And I'm saying that if it doesn't affirmatively exist, it should be recognized in Illinois, regardless of whether, um, there is a restriction if you have other negligence claims that could be brought that would complicate such a claim. I'm saying that there are inroads into, uh, the presentation of that type of claim in an Illinois court. So you're not reading, uh, Doe versus McKay saying that there is no tort in the state? I, I do. There is no such tort. You're not reading the Supreme Court to accept that? I don't read Doe versus McKay as saying that. No. I believe the preceding opinion, which Doe discusses, does convey, um, that Illinois would be receptive to such a claim. Um, I don't have that in front of me, the name of that case in front of me. I do believe my brief does discuss it, though, Judge, in, in that section. Well, who can, I mean, who can say there is that claim? Is, does that have to be the Supreme Court of the state establishing that through adoption of restatement or adoption of some other entity? Or can a trial court do it? Can we do it? I do believe that, um, a, a trial court, uh, could allow for a modification of existing law, uh, on a good faith basis, and then it would be up to the, uh, appellate courts of the state to decide whether or not it would be allowed in the state or not. Um, otherwise, there would be no advancement or evolution in the law if only the Supreme Court could make a, a, a gateway pronouncement on whether a claim can proceed without it having germinated in the trial court or in the appellate court. In this case, it, we did plant the seed in the trial court, and it was rejected, um, by the trial, Judge Murphy. And based upon your research, there is no other appellate district that has, uh, considered this, even considered it, basically. Not, not just denied it, but considered it. Uh, aside from the two cases that I discussed in my brief, no, I did not cite any others. And I think that that was, it was a restatement of torts, um, recitation about how this case, law started. One other question, Mr. Sterni, um, that I have. You had, uh, filed a, uh, false arrest claim, and you, you listed Martin also as a defendant in that claim. Did Mr. Martin make any arrest of the defendant? I don't, and this is my recollection of the, the facts, not, Martin did not physically arrest, I don't believe, physically arrest the, the plaintiff. Then how would that claim stand if he did not, uh, make the arrest? I, you know, if he ultimately did not physically make the arrest or seizure, uh, I'm not, I can't prog, not, I can't advance that he would be able to proceed to trial on that claim. But would his involvement in procuring what he knew to be a not valid, uh, claim, uh, have anything to do with his, uh, ability or his involvement in a false arrest? It could be if, depending on how much further involvement he had after the, a warrant was issued. Because an officer, uh, if he perpetuates a warrant that he knows to be false, or an indictment to be false, uh, he can be subject to liability, which is the facts in Juris v. McGowan. And that circumvents this whole issue of the perjured testimony in a grand jury proceeding because if the officer then continues on perpetuating it in trial and so forth, that would subject them to liability. You've never actually charged them or, or alleged that they, as a primary allegation, that anybody lied before the grand jury, correct? Your allegation is false arrest. I do believe the fact, maybe not the word lie, but I think that the complaint, the reading of the complaints would show that he, he, there was misstatements made to the grand jury. All right. All right. Thank you, Mr. Sterney.  Thank you, Judge. The appellees argue. Appellants, why do I keep saying that? Okay. Ms. Samuelson, come on up. Oh, I'm sorry. It's not Ms. Samuelson. It's Ms. Gagey. Next. This is going where? Eight minutes. Ms. Gagey, you are here on behalf of the Advocacy Center, correct? The Advocacy Center, Tim Martin and Kane County, Your Honor. You may proceed. May it please the court. Your Honor, as counsel, my name is Erin Gagey, and along with Deborah Lang, I represent the defendant appellees, Timothy Martin, Kane County, and the Kane County Child Advocacy Center. Walking through the amended complaint, there are a number of different issues that we feel defeat each and every claim. Those are immunities, those are pleading deficiencies, and as a threshold jurisdictional matter, we believe that there is an issue with the claims alleged against these defendants as they are state law claims which are properly heard within the Illinois Court of Claims. Your Honor has directed us to the case of Lohman, and along with White and with Healy, those cases discuss the application of the Illinois Court of Claims Act as to employees who are considered state law employees. How about employees who are acting outside or beyond the scope? Certainly. That's one of the elements that the courts look at when they decide whether a case really is one against the state. And significantly here, plaintiff, although he says the complaint is alleged against Tim Martin in both his individual and official capacities, he does not affirmatively state that Mr. Martin acted outside the scope of his employment. So for each of the other elements as to a claim being one against the state of Illinois, we believe that an analysis of the activities that are alleged against Mr. Martin are those that are underneath his capacity and purview as a state employee. His position is created. Well, let me ask you this. If he didn't allege specifically outside the scope or beyond the scope, did he not allege intentional torts? He did allege intentional torts. So with those intentional torts, I can't imagine that the state would be encouraging either the Ad Center or King County would be encouraging more prosecution, correct? Certainly not, Your Honor. So if he were able to amend those claims, if they weren't dismissed without prejudice, wouldn't he have been able to address that more specifically? Your Honor, we believe that, and as I mentioned, these arguments kind of intermesh. Under the 615 pleading standard, we don't believe that he has done that. We don't believe that any of the facts in light most favorable to the plaintiff, taken any of the actions that Mr. Martin is alleged to have done, we don't believe that those state a claim on their face for each and every state claim. Now, as to the remaining federal claims, we believe that the Allen Castro case stands for the proposition that once state law claims are sent down to the court of claims, the remaining pendant federal claims are dismissed as well. And the reason behind that is the premise of 11th Amendment liability. When you're talking about federal claims being had against what is essentially the state of Illinois, that can't be, that's not proper under federal principles. But if they're not sent to the court of claims, there is an issue, there is still an issue for the state court as opposed to the court of claims to decide, correct? There could be, there could be, or this court could dismiss them all outright. Plaintiff could choose to refile them federally. But again, we believe that those would not be, they wouldn't be bifurcated. Now, talking about the federal claims against Martin in 1983, did you look at the will case? The will case basically talks about the sovereign immunity or the absolute immunity, saying that Congress has presumed that people are acting within basically their official capacity. But if they're not acting with their official capacity, how do you give absolute immunity? And are you submitting that Mr. Martin was acting within his official capacity? We submit first that he was. In the alternate, if that's not found to be the case, we believe that in different instances and based on the different stages of facts that plaintiff alleges, Mr. Martin is entitled to either absolute immunity or qualified immunity depending on the type of activity that he's alleged to have committed. One of the points that I want to make clear to this court is that Mr. Martin is not alleged to have testified before the grand jury. Mr. Jones is the one who testified before the grand jury. And as plaintiff says in his amended complaint, the sole basis of the indictment was Mr. Jones' testimony. So to the extent that absolute immunity could apply to any of the federal claims against Mr. Martin, I would direct the court's attention again to the Rayburn case. One of the things the Rayburn case says is that you can have absolute immunity for grand jury testimony, but you can't plead around that absolute immunity by also pleading a conspiracy claim. So the federal conspiracy claims that attempt to tie Mr. Martin into that false grand jury testimony to the extent that they do, we believe that absolute immunity applies for Mr. Martin in those instances. Beyond that, qualified immunity we believe applies to the remaining federal claims because as the court knows, qualified immunity will protect a state government employee where there has not been a violation of a clearly recognized or established constitutional right. We don't believe that plaintiff as a pleading matter has elucidated any particular claim, any full claim against Mr. Martin or the CAC or Kane County under a Monell theory. Well, you said or a fully identified claim. That is the issue of the right to replead. So you're saying that he should have the right to replead or he should not have the right to replead? We think that given the various immunities that apply, it would be futile for the plaintiff to replead again. We believe that as to the federal claims, there is no set of facts that could overcome those various immunities, such as they exist before this court and as they exist in the full world, in the full scope of the evidence. Going back to the remaining immunities, as to the CAC and as to Kane County, one thing that I do want to point out and talk about a little bit is the fact that Mr. Martin is not a Kane County and is not a CAC employee for purposes of the legal issues in this case. He's with the state's attorney's office. He's with the state's attorney's office.  And as the Bigger, Staff, and Moy cases make clear, those types of elected county officials are considered functionally state actors for purposes of liability and immunity. And what is, I know what the CAC is, but what is its authority? What is its foundation? The Illinois legislature has an enabling statute within, I believe, the county's code, and it's called the Child Advocacy Center Act. And it talks about the authorities that are given by counties to create an interdisciplinary, collaborative approach to investigating and prosecuting child abuse, sexual abuse, and neglect cases. And so each county sets up through its county board, and the Kane County board has enacted and established a board for the CAC. And in our case, the state's attorney's office sends over several prosecutors to work functionally in that building. And the purpose is, one of the purposes is to, when dealing with these sensitive child victims, may I finish? Yes. The purpose is to not subject, one of the purposes is to not subject children to repeated traumatic investigative interviews. All right, so it would be considered a county arm as opposed to a state arm? It's difficult to say, Your Honor. We believe that for purposes of this case, when we're talking about Tim Martin, the CAC isn't a type of entity that can control or direct Mr. Martin's employment, actions, or firing. Who trained him? He's trained by the state's attorney's office. And the state's attorney's office is paid by the county, however, pursuant to the statute, it's the state office? Yes. Correct? Yes. And then the immunities lie with a state employee? Yes, that's correct. So he falls under the state's attorney's office? That's what we posit to the court, Your Honor. Now, Mr. Cerny talked about some bylaws or some rules that were set out in the state's attorney's office, or in the Children's Advocacy Center. There were some bylaws or something that he talked about. Let me see if I can find them in all my notes. Do those bylaws or rules, guidelines, that would probably be better called guidelines, apply to Mr. Martin in this case? Your Honor, I don't know that those rules or bylaws were made part of the record at the circuit court level. I don't believe they were. However, we maintain that, functionally, the rules, and particularly to the safety plan, I assume Your Honor is getting at the safety plan issue. No, I'm not getting at the safety plan. And I apologize, I should have found this before I asked the question. But there is a point where Mr. Cerny talks about some, I think they were guidelines for the advocacy center, but quite frankly, I think those guidelines were referring to sexual assault cases and weren't referring to any physical abuse cases. Let's talk, though, while we're talking about the safety plan. Was there ever a safety plan? Your Honor, frankly speaking, I don't know. I don't think it was ever made clear by the pleadings. Plaintiff acknowledged in one of his pleadings below that there may have been a safety plan in place. Did anybody ever produce a safety plan to Mr. Barnes in this case? I don't know, Your Honor. I think DCFS controls the issuance of a safety plan. I think, as seen in the amended complaint, there were at least five or six or seven different people who believed that a safety plan was in place. And in the moment of this terrible damage to this child, I believe the primary consideration was his safety. Who made the representation to these seven or eight people that there was a safety plan in place? I don't know that, Your Honor. I couldn't tell you that. I'm sorry. Okay. All right. Any further questions? Justice Hutchinson. Thank you. Thank you. Thank you. Now Ms. Samuelson. Good morning. Good morning, Your Honor. You may proceed. May it please the Court. My name is Amber Samuelson, and I'm here on behalf of the Aurora Defendants. When the appellant was giving his argument, he touched upon the Rakeberg case, which was brought to our attention by the Court. This case, I think, firmly supports our argument that the Aurora Defendant, specifically Officer Jones, is protected by absolute immunity. The only real substantive allegation against Officer Jones is that he testified before the grand jury. And this testimony under Rakeberg is given absolute immunity. Now, appellant stated that there is other evidence in his complaint that would support his malicious prosecution and false arrest claims. Specifically, appellant focused on the family involvement and errors that he thinks occurred in the investigation. However... Well, I'm not so sure there are errors in the investigation. That might be a polite way to describe what I think Mr. Barnes' position is. There were misrepresentations alleged to the grand jury. And as a result of that, an indictment and an arrest warrant issued. Isn't that actually what's being alleged? That is what's being alleged. However, under Rakeberg, this testimony given by Officer Jones before the grand jury is granted absolute immunity. Even if it's false? Even if it's false. But that's not the charge he's making here. The charge he's making is that there was a false arrest, a warrant. That a warrant was served and that Jones and or Martin should have known, based upon this investigation, that that warrant was not going to hold water. Your Honor, to clarify... And Rakeberg doesn't cover that issue. The arrest warrant... There are no allegations in the complaint that Officer Jones had any involvement regarding the indictment or the warrant or even with making the arrest. In fact, I think in the complaint it stated that the North Aurora Police Department are the ones that actually arrested Mr. Barnes. Who went to get the warrant? I don't know and I don't believe that is actually applied in the complaint. I would imagine if it was North Aurora Police Department that arrested Mr. Barnes, that there might be some involvement. So it wouldn't be the investigators that have worked on the case from the beginning until the outset. Those two fellows would never go get an arrest warrant. Your Honor, I don't know who... To be honest, I don't know who went and got the arrest warrant. Don't you think that's something we probably should have looked at prior to coming to oral arguments? In light of the fact that your client is the one that's being charged with... It's being alleged that he is the one that falsely arrested this individual? Wouldn't that have been a good idea? Or do you know and you're just not telling us you know? Your Honor, the case before you is here on a 615 motion. So it's a failure to state a claim in the pleadings. If the claim is false arrest against my client, Officer Jones, then somewhere within the pleadings, you would imagine there would be a claim that he was ultimately involved in arresting the appellant. In the pleadings, the only involvement of Officer Jones is the investigation and that he testified before the grand jury. Beyond that, there are no allegations against Officer Jones in relation to the actual arrest. To argue that the testimony before the grand jury, which ultimately resulted in an indictment, and then that led to his arrest, is therefore a basis for a false arrest claim. That testimony before a grand jury, false or true, is granted absolute immunity. And under the Rayburg case, that immunity extends to any 1983 claim. Not just the 1983 claim before the court. Furthermore, in regards to the Rayburg case, the appellant raised the issue of the reasoning in Fabiano. However, in Fabiano, they looked to see if there were any Supreme Court decisions on immunity. And the court in Fabiano noted that the Supreme Court had not yet addressed extending immunity to grand jury testimony. Further, in this particular case, there were further allegations against those particular defendants beyond just this grand jury testimony. You can finish your thought. Your Honor, in the case at hand, the only real allegation against the defendants, Officer Jones and the royal defendants, is that he testified before a grand jury. There's no allegations beyond that in relation to the prosecution of the plaintiff or to the arrest of the plaintiff. Even though I think there are allegations that he ignored exculpatory evidence, made false reports, and testified falsely before the grand jury. It's just not testified falsely before the grand jury. Your Honor, those allegations are not in the complaint. And specifically, if you look at paragraph 49 of the complaint, it says that the sole basis for the indictment was Jones testimony before the grand jury. There are arguments contained within the plaintiff's brief, or within the appellant's brief, that were never actually alleged in the complaint. And since this is a 615 motion, which goes to an appeal of dismissal under 615, which goes to the sufficiency of the complaint, any allegations that were not made at the pleading stage cannot now be raised on appeal. The appellant failed to make a sufficient claim, failed to plead the elements necessary to meet his burden, and that's ultimately one of the reasons why his complaint was dismissed. Okay, I'm looking at count two. Illinois Militia Prosecution against Defendants Martin, Jones County, King County, and CAC. Number 76, paragraph 76. The aforementioned defendants willfully and wantonly excluded or ignored exculpatory evidence and fabricated testimony to instigate proceedings. That sounds like an allegation to me. Your Honor, that goes directly against then his paragraph 49, which says that the sole basis for the indictment was that Jones testified before the grand jury. He's talking about that issue in one place, but this is alternative pleading. You're only addressing the one issue, not the alternative that he's in count two. And to the extent that he makes the allegation, he does not expand upon what it is. He doesn't have to prove it in the petition or in the pleadings. He has to allege it in the pleadings. Did he not allege it in paragraph 75? If that's what it says, then yes, he did allege it. Thank you. Thank you, Your Honor. Thank you. Ms. Bush. May it please the court. Ms. Bush, before you start, let me ask you, did the doctor or anybody at Loyola Hospital ever see a safety plan? Not that I'm aware of, Your Honor, but there's been no discovery in this case because this has all been done in the pleadings. The only allegation against Loyola is for the actions of Barry Bennett, who was the social worker. According to the allegations in the complaint, Barry Bennett informed Mr. Barnes that he had been told there was a safety plan. Did Mr. Bennett ever see a safety plan? I don't know. I don't know. Did you talk to Mr. Bennett and ask him, did you ever see a safety plan? No, I had not talked to him. I was not the attorney handling the case. So did you talk to the attorney handling the case at the lower level? I did. Did you ever ask him, did Mr. Bennett ever see a safety plan? I did not. Do you think that might have been a good idea? I don't think that it matters, Your Honor, to be perfectly honest. So since we're going forward on a 2-6-15 motion, we're just going to bury our head in the sand, not know any of the facts. Is that the way we're proceeding? Oh, no, I didn't mean to insinuate that at all, Your Honor. I think what I meant to say is that it doesn't matter for purposes of this motion because of the fact that this is based solely on the statute of limitations. Right, outside of the two years. Now, counsel claims or states that he is extending the two-year based upon, I guess, the extended injuries caused to this plaintiff. Tell me why he's wrong. Because an extension of a wrong, an injury based on one initial contact, it does not make continuous tort. So it has to be the continuous negligence, not the continuous injury. In this case, Mr. Bennett had one and only contact with Mr. Barnes. That was on August 17th of 2009. The allegations in the complaint were filed on December 1st of 2011, clearly beyond the two years. Mr. Barnes has had five opportunities, actually, to correct this, to allege that this action fell within the statute of limitations or within a continuous course of treatment simply by alleging if he knew, if it were true, that the child was still in the hospital by December 1st of 2011. May I continue? Yes. He had the original complaint. He had the amended complaint. He had the oral argument when he was trying to request leave to file an amended complaint where he could have said, Judge, I have something that would remedy this, and he did not make that argument. According to Judge Murphy's rule or order, it appears that he was simply arguing that the wrong continued until today. And as Judge Murphy argued, there is no allegation in the amended complaint or in logic that the conduct remained unabated even until the present time. And again, in the appellate brief, and then I even asked for him to state in the reply brief the date of discharge of this child from Loyola, and he has not taken that opportunity to do so. Therefore, on its face, the actions against Mr. Bennett and Loyola are barred by the statute of limitations. I have nothing further. Thank you. Thank you. Now, Mr. Sternies, let's start where she left off. How do you get around the statute of limitations in this case? Your Honor, it's important to note that Loyola did not file a motion to dismiss the original complaint. They did not respond to it at all. They were dismissed at the trial court level, correct? They were dismissed. Based on statute of limitations. On the amended complaint, right. Correct. And what we responded into their motion on the amended complaint was that there was a continuing wrong. But the case law doesn't allow for a continuing wrong. How do you get around that? I believe it does, but there's a continuing violation. What was the continuing violation in this case? Every day that Mr. Barnes was barred from seeing his child was a barrier to him or a violation or a new occurrence. How about when he was released from Loyola? Once he was released from Loyola, you're counting those days thereafter against Loyola? No. So when was he released from Loyola? He was not released until long after they claimed the statute expired. The complaint was filed on the date of the handing down of the grand jury indictment two years from that date. And at that point in time, the child was still at Loyola, and that's part of the problem, Judge. We weren't given leave to replead, to make allegations as to how long the child was in Loyola and respond to this notion that there wasn't a continuing wrong here or a continuing violation. What happened is- Well, you did file an amended complaint. I did, Judge. But the first time this question of statute of limitations was raised was on the motion to dismiss the amended complaint. And in the response there, I said, Your Honor, to the trial judge, let me amend to deal with this. I have to deal- On a motion to dismiss, we can't just start tossing amended complaints into the record. We have to deal with the complaint as it's written, and I have to respond to the motion as it's written. And it's inappropriate to ask for amendments in the response to a motion to dismiss. I did say that this would be appropriate, and I did indicate that, but Judge Murphy dismissed it with prejudice. One thing I want to point out with respect to the safety plan is the complaint says it doesn't exist. It just doesn't exist, and that's the allegation, and I, to this day, never have seen it. Mr. Bennett said that there was a safety plan. Right. And whether it exists or not is not the issue at this point. He said there was a safety plan. Did he ever tell him, did he ever tell Mr. Barnes after that that he could not visit, or was that a function of what happened with Mr. Jones, or Officers Jones and Martin? No, that's two separate paths. Mr. Bennett told the plaintiff, you cannot see your kids. There's a safety plan in place. Don't come back, or I'll have you arrested. Mr. Barnes already had enough problems, so he did not go back to Loyola University to see his son, who was on the verge of dying. Now, what Mr. Martin and Mr. Jones were doing were also threatening Mr. Barnes, saying, you cannot see your child because there is a safety plan in place. Well, where did that leave Mr. Barnes? To go on a safety plan, when you get it, it will give you a document identifying your paths to appeal or try and address it. But the fact of the problem is, is that it didn't exist, and no one bothered to go and find it. And as to Martin and Jones, I'm alleged that they violated federal law by being improperly trained. They're in this child advocacy center, but then they say it's all DCFS' fault, but they're in a child investigative center, and they don't bother to know what a safety plan is. They're saying we're immune from liability. That's a separate constitutional claim, and there's been a lot of discussion about the First Amendment claim, or the false arrest claim, but there are three bodies of federal claims that we've raised, and really, I think, in retrospect, I should have created a matrix to show which immunities apply to which claim. Well, could your client have looked for the safety plan, or did your client not want to know the answer? There was no way to find it. He did look. I did allege he did ask officers, Martin and Jones, where is the safety plan? Show it to me. They said it exists. You can't see your kid. The safety plan is a private document. So Bennett told him one time there was a safety plan, correct? Bennett told him one time, and don't come back. That's it. That's it. And then Mr. Barnes picked an option out of a hat and went to the circuit court in the child custody division with respect to the children's mother and wanted to see his children again in order, and the court said, I don't know what you're talking about. There's no restriction. When was that? That was the morning of the indictment, December, I believe, 13th, which is the date the original complaint was filed. December 13th. He went to child court in the morning. The court says you can see your kids. I don't know what you're talking about. That afternoon the indictment was handed down in Missouri State. So then how are you not outside of the statute of limitations? How do you continue to hold Loyola responsible after he knew in 2011 that there was no safety plan? If I were allowed to amend, I would say that the child was still, the baby was still in the hospital, and the plaintiff was still barred from seeing them because of that. On December 2011? Yes. Yes. Absolutely. Absolutely. And I believe the child was still in the hospital long after that. All right, but on December when you filed the complaint, which was December of 2011, that same day you had learned that there was no safety plan? No, no, no. We were given an order of a court saying there is no, no one raised the basis for you not seeing it. Mr. Barnes presumed it was in the Domestic Relations Court, I forget what the proper title is, I don't practice in that field, that that's where he should go to address the safety plan, and all he was told is this is not where you go for a safety plan. And as the underlying record demonstrates, the safety plan is an agreement between the parents and the state to engage in a certain course of conduct. There was no agreement. Okay, so August 15th, 2009, the defendant is charged, his son is taken into the hospital. December of 2011, I can't see, December 1st of 2011, you file the complaint. Correct. And at that point, you're alleging that Loyola is continued in a continuous course of conduct to preclude your client from seeing his child? As of December 1st, 2009, two years prior to the filing of the complaint, he was still barred from seeing his child based on this erroneous thought that there was a safety plan. Toward December 1st, 2009, on that date, Loyola was still barring him from seeing that child. Well, he wasn't even trying to go then, though. Well, that's relating to the notion of the continuing tort, that every day, you know, you don't have to go back to the hospital every day to know that they're not going to let you in or arrest you. The threat was if you come back, you're going to be arrested. But this is a man who has gone to the trial court and asked to visit with his children because there's a daughter involved, too, to see his children. And the trial court says, you can see your children, and he still doesn't try to go. Why not? Well, that day, he was indicted. And then a condition of his bond, as alleged in the complaint, was that he could not see his children. So the trick is here on that date, the statute, I mean, at a minimum, splitting hairs to the maximum extent, we are okay on the statute of limitations because we had one year after that date. And remember, when they changed the restriction from there's a safety plan, you can't see your kids, to it's a condition of your bond, that's a whole other path of review. And he did ask to have his bond reviewed on that. But that doesn't mitigate or help the Loyola defendant to discharge the complaint on the statute of limitations because on that date, he still, Loyola was the one responsible in not allowing him to see his child, his baby. I'm well over my time, Your Honor. I appreciate your indulgence. May I briefly conclude? Yes, you may. Your Honors, this is not an easy case. It's a complex case for the overworld trial judges, and I know that they tried their best. But there's a lot of moving parts here, and I think that at a minimum, it should go back to try and clarify through this and sift through the facts a little more and take a more detailed view of some of these immunities that are raised. There's a U.S. Supreme Court case that's been handed down in the interim since some of these rulings have been raised. I would ask that the matter be reversed and sent back to the state court to address the deficiencies of some of these rulings. There are some counts that were dismissed at the trial court you never addressed, though, so you're not quarreling with the dismissal on some counts that you didn't address? I believe one of them was the Brady count. I do not quarrel with that dismissal. But I think the ones that are in play are the Fourth and Fourteenth Amendment claims of the false arrest, the federal conspiracy with that, then there's the federal denial of family relations and the conspiracy attendant to that, the state law counts of malicious prosecution, conspiracy in malicious prosecution, and intentional infliction of emotional distress, and the state law-based claim of interference with family relations. So there's a lot. And this would be, and you're alleging this would be against all defendants other than, was the state's attorney himself? We are not appealing the state's attorneys. So that one's out. That one's out. To answer your question, I believe that, for example, Mr. Thomas, the chief of police of Aurora, some of the state law counts are not against him because he's only in as a policymaker under Monell. So the policymakers wouldn't be responsible. But as to each count in the amended complaint, it tells you, I stated which defendants it's against. All right. I still am searching for a case, and if you have one, that would be great, talking about interference with family relations that says that it is a valid cause of action in the state of Illinois. I think what I would, I'm going to do, Your Honor, is just to reexamine that history of Doma v. McKay and the case law history because I believe it's the case immediately preceding Doe where they talk about the restatement of torts and where Illinois discusses that. And I don't think that, I don't believe off the top of my head that the appellate court that decided that issue said there is such a cause of action. However, they did dispose of it on the merits. And then it was subsequently addressed again in Doe where they said, you know, negligence counts and medical malpractice counts, and you don't need this, to paraphrase the Supreme Court. But I think that they didn't say it would not survive in a case such as this where there is no attendant or parallel claim of liability. Well, in similar fashion, you have negligence issues, intentional infliction. You have false arrest, malicious prosecution. So wouldn't this, couldn't we just layer this on top and say you don't need that either? Not really, because the federal claims are intentional in nature, so they wouldn't be negligent-based. But second of all, the federal claims could be wiped out and you could still have this interference with family relations stand. Whereas, for example, in a medical malpractice case where your baby dies in the hospital and there is no medical malpractice, you cannot have an interference with family relations case that's predicated solely on the negligence. This case is predicated on intentional conduct, direct intentional interference. So I think this is a better case, factually speaking, to make that law than Doe v. McKay. Thank you so much. Thank you. Ladies, gentlemen, thank you for your time and your intelligent arguments. We really appreciate it.